**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **FRANK COTTLES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No.  06 C 2068** |
| **v.** | ) | |
| **BANK OF AMERICA, N.A.,** | ) | **JUDGE DAVID H. COAR** |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Frank Cottles (the "Plaintiff") is suing his former employer, Bank of America, N.A. (the "Defendant"), for reverse race and gender discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 12101 *et seq.* and 42 U.S.C. § 1981 and age discriminat[ion in violation of the Age Discrimination in Employment Act ("ADEA") , 29 U.S.C. § 621 *et seq.*  Before this court now is Defendant's Motion for Summary Judgment for each count of Plaintiffs' Second Amended Complaint.  For the reasons set forth below, Defendant's motion is **GRANTED**.

**I.      STANDARD FOR SUMMARY JUDGMENT**

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists only if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The movant bears the burden of establishing

that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the movant meets this burden, the non-movant must set forth specific facts (a "scintilla of

evidence" is insufficient) demonstrating that there is a genuine issue for trial. Fed. R. Civ. P.

56(e); *Anderson*, 477 U.S. at 252; *see also Celotex*, 477 U.S. at 324. When reviewing a motion

for summary judgment, the court must view the facts in the light most favorable to the

nonmoving party and draw all reasonable inferences in that party's favor. *See Schuster v. Lucent

Tech., Inc.*, 327 F.3d 569, 573 (7th Cir. 2003). This standard of review is applied to employment

discrimination cases with "added rigor." *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038

(7th Cir. 1993).

## II.     RELEVANT FACTUAL BACKGROUND

**Undisputed Facts**

Defendant operates a Check Processing Center (the "Center") in Chicago. Cottles is a

White Caucasian male who was an operations manager in the Center. He was terminated from

his position on May 14, 2004. At the time of termination, Cottles was 45 years old and drawing

an annual salary of $81,665. Cottles was terminated by Ngoc Wozniak, an Asian woman who

was around 33 years of age at the time of termination. Wozniak was the site manager of the

Center. She consulted with her supervisor, Richard Wheeler, a White Caucasian male who was

around 58 years of age at the time of termination. Wheeler is the Defendant's Midwest region

Manager. Wozniak replaced Terry Jordan, another White male, as the site manager of Center.

During Wozniak's tenure as site manger, there were five operations managers; three White males

including Cottles, one Hispanic male and one African-American woman. Wheeler originally

identified Michael Maddox, another White male who was at or about 54 years of age in 2004, as

a suitable replacement for Jordan.  However, Maddox declined to take the job based upon his reluctance to leave Jacksonville, Florida and relocate to Chicago, Illinois.

Defendant recognized that the check processing associates in the Chicago Center had very low morale.  The low associate morale was linked to dislike and distrust of the existing management team of the Chicago Center.  The majority of associates were African-American and/or women.  Wozniak was brought in to the Chicago Center to improve the level of associate morale and to make the Center run more efficiently.  Her efforts included holding town hall meetings, associate listening sessions and a rewards program for associates called the WOW Pins program.

In early May 2004, Defendant held a meeting of managers and administrative personnel to judge associates' entries of drawings into a contest (the "Wow Pins meeting").  This meeting was led by Christine Clark, an African-American female.  Cottles also attended this meeting.  Each entrant was to receive ten dollars, but the flyer advertising the contest communicated to the associates that each entry was to receive ten dollars.  Therefore some associates submitted multiple entries in an attempt to maximize their prize money.  The managers, including Cottles, engaged in a spirited discussion about the appropriateness of the multiple entries with the consensus agreeing on rewarding the multiple entries.

A few days later, Clark attended a meeting with Wozniak and another of Defendant's employees.  At the meeting, Clark became upset when she received criticism of her performance from Wozniak.  She thought she was being treated unfairly and unduly harsh in light of the lack of discipline given to Cottles for his allegedly inappropriate statements at the Wow Pins meeting about associates who submitted multiple entries.  She then relayed her version of what occurred

at the meeting, which was that Cottles was upset over associates submitting multiple entries and that he made statements about getting even with them. Wozniak assured Clark that she would investigate Cottles' behavior. Thereafter, Wozniak spoke with Richard Shelton and Rafael Delgado, two managers who were also at the Wow Pins meeting. Delgado told Wozniak that Cottles made statements that could be considered retaliatory. He told her Cottles said, "If that's how he's going to do it, then I will get even with him." Richard Shelton confirmed to Wozniak what Clark told her Cottles said at the Wow Pins meeting. Wozniak called Wheeler to discuss the incident. She also called the human resources department responsible for providing guidance to managers contemplating disciplinary actions. Wozniak concluded Cottles should be terminated because of his retaliatory remarks. She told him prior to terminating him that she was firing him because of his statements and that she would not allow him to ruin all of her hard work over the past four months. Wozniak labeled Cottles' conduct a loss of trust and confidence. In her own words expressed in an internal email dated May 14, 2004 to Lance Drummond, a member of Defendant's upper management, Wozniak cited concerns about the "Chicago Market situation and the amount of work that [lay] in front of [them] and the trust-building efforts with the associates" in her decision to terminate Cottles. After terminating him, Wozniak announced to the entire Chicago Center that Cottles was fired.

Wozniak also terminated Alison Seraphin, an African-American female operations manager. Wozniak labeled Seraphin's behavior as a loss of trust and confidence but she also cited her performance deficiencies as well. Several associates complained that Seraphin's abrasive and brash communication style, lack of leadership and inappropriate, harsh behavior.

However, prior to terminating Seraphin, Wozniak counseled her and gave her several opportunities to rectify her deficiencies.

Lori Conti, a female team lead, repeatedly engaged in conduct deemed to be inappropriate workplace behavior by BOA, yet she was not terminated for such behavior but was allowed to receive verbal and written counseling. Cathy Wallace, an African American female team lead, committed a serious security infraction which was deemed by Defendant to be a breach of trust, yet she was not terminated for such behavior, but was allowed to receive only a disciplinary warning. Team leads, who according to Cottles himself, were subordinate to operations managers and were not supervised directly by Wozniak.

**Disputed Facts**

Cottles states that he did not make threatening or retaliatory remarks in the Wow Pins meeting and that it was Clark who led the charge of those against the associates who submitted multiple entries into the contest.

## III.    ANALYSIS

### A.    Race Discrimination

Cottles proceeds under the burden-shifting method using indirect evidence as set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800-06 (1973). Under the burden-shifting approach, a plaintiff bears the initial burden of establishing a *prima facie* case of intentional discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 505 (1993); *Hall v. Bodine Elec. Co.*, 276 F.3d 345, (7th Cir. 2002); *Miller v. Am. Fam. Mut. Ins. Co.*, 203 F.3d 997, 1007 (7th Cir. 2000); *Szymanski v. County of Cook*, 2002 WL 171977 at *5 (N.D.Ill.). Once the plaintiff establishes a *prima facie* case, a rebuttable presumption of discrimination arises, and the burden

of production then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Szymanski*, 2002 WL 171977 at *5. If the employer satisfies that burden, the presumption of discrimination is rebutted, and the burden shifts back to the plaintiff to persuade the trier of fact either directly that a discriminatory reason more likely motivated the action or indirectly that the employer's articulated reason for the employment action is unworthy of credence and is but a mere pretext for intentional discrimination. *Id.*

In order to establish the *prima facie* case based on disparate discipline under the *McDonnell Douglas* schema, a plaintiff must provide evidence that "(1) he is a member of a protected class under Title VII, (2) his work performance met the employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) similarly-situated employees outside of the protected class were treated more favorably by the employer. *Goodwin v. Bd. of Trust. of Univ. of Illinois*, 442 F.3d 611, 617 (7th Cir. 2006). If a plaintiff proceeding under the indirect method fails to establish any one of the four factors of the *prima facie* case, the court generally need not proceed any further and summary judgment will be entered for the defendant. *See Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 331 (7th Cir. 2002); *see also Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680-681 (7th Cir. 2002).

The Seventh Circuit has stated that in so-called "reverse discrimination" cases, white Caucasian (or male) plaintiffs must show other "background circumstances" in lieu of their inability to satisfy the first element. *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 454 (7th Cir. 1999). The *Mills* court identified several kinds of background circumstances a plaintiff could use to establish a *prima facie* case in a reverse discrimination case. That Court also cited *Harding v. Gray*, where the court articulated two categories of evidence that satisfy the

background circumstances test: (1) evidence indicating that the particular employer has some reason or inclination to <u>discriminate invidiously</u>; or (2) evidence indicating that there is something "fishy" about the facts of the case. 9 F.3d 150, 152-53 (D.C.Cir. 1993) (cited in *Mills*, 171 F.3d at 455). Something can be "fishy" if a plaintiff presents evidence that the employer's actions "departed from the usual procedures in an 'unprecedented fashion.'" 171 F.3d at 455.

Here, Defendant contends summary judgment is appropriate for several reasons. First, Defendant contends that Cottles cannot demonstrate any background circumstances that indicate the Defendant was inclined to discriminate against white males in favor of minorities and women. Second, Defendant argues that Cottles cannot point to any similarly-situated employees that are suitable for comparison under the *McDonnell-Douglas* analysis. Lastly, should this Court find Cottles has demonstrated background circumstances and similarly-situated employees, Defendant contends that Cottles cannot present any evidence sufficient to show that the stated reason for his termination is false.

### Background Circumstances

Cottles cites *Preston v. Wisconsin Health Fund* for examples of background circumstances that have been held sufficient to provide a basis for a factfinder to conclude it is plausible for an employer to have discriminated against White men in favor of minorities or women. 397 F.3d 539 (7th Cir. 2005). Those examples include situations where those "running the company are under pressure from affirmative action plans, customers, public opinion, the EEOC, a judicial decree, or corporate superiors imbued with belief in 'diversity' to increase the proportion of [minorities or] women in the company's workforce." *Id.* at 542 (citations omitted).

Cottles contends that Defendant's upper management members were aware the Chicago Market was perceived as having a "good old boys" managerial network. These "good old boys" are thought to generally consist of informal networks of White men and engender negative reactions, hostility and a sense of futility in those people who are not members of these networks yet work in places were such networks exist. In Cottles' view, this "good old boys" network was directly responsible for the low-associate morale in the Center. Thus, Defendant's motivation in firing him, a White male, was to dispel the perception held by the predominately African-American and female associates that there was a "good old boys network" in operation in the Chicago market.

In support of his theory Cottles presents evidence that Defendant was concerned about low associate morale in the Center. (Defendant agrees that associates in the Chicago Market were suffering from low morale, but does not agree that the causes were linked to the racial or sexual makeup of the management team. Instead, Defendant attributes the low morale to the associates' mistrust and fear of the managers due to the managers' maltreatment of and miscommunication with them.) Cottles has also presented evidence that there was a perception that there was a "good old boys" management team.[1] Cottles has also presented evidence that tends to make it plausible the Defendant intended to eradicate the perception of a White male dominated management team by diversifying the management team and "mix things up." Furthermore, his evidence can support an inferential link between the eradication of the perception and discharging White male managers on the basis of their color or sex.

_____

[1] Most of this evidence is probably pure hearsay not subject to any exception under the Federal rules, but Defendant has chosen not to challenge it.

Defendant admits it had a problem with low associate morale. Associates felt like the Chicago operation's management team was a closely knit association of "golfing buddies" who did not have the best employment interests of the associates in mind. Wozniak stated as much to Cottles. She told him the associates felt the managers distrusted them and were untrustworthy themselves. Lee Elder, an operations manager who supervised other managers and associates, testified at deposition that there was talk of a "good old boys network" in meetings but he could not recall the specifics. Richard Shelton, a day shift manager in item (check) processing and one time division manager, testified at deposition that he had heard of the perception of a "good old boys" network, that he had heard Wozniak discuss it several times and Wheeler discuss it once. Shelton also testified that he could not recall if Wozniak was ever under any pressure to do anything about the perception. Cottles testified that Wozniak told him about "perceptions" of the Center and that Wheeler did the same in a private conversation. He also testified that Wozniak said she had a discussion with Lance Drummond, a member of upper management, about "perceptions" in the Chicago office. In response to the question of whether he was aware of people within Bank of America perceiving the Chicago operation as having too many white male managers and needing more diversity, Terry Jordan, the Chicago check processing site manager prior to Wozniak, stated "to some extent yes." He also stated he thought he would have to address that perception when he arrived in Chicago. (Apparently, he never did.)

Elder testified that he never discussed with Jordan or any other managers whether the "good old boys" or "old white man's club" had to be broken up. Tonya Thompson-Thomas, an employee of Defendant's who held listening sessions with associates from various departments of the Center and otherwise monitored associate morale, testified that the associates never

reported to her that they did not trust management because of a perceived lack of diversity, but nonetheless they felt their opportunities for recognition and advancement were limited. She later testified that a few associates felt their lack of advancement was due to the managers being predominately White. Nothing in her testimony allows one to gauge how prevalent that feeling was across the entire pool of associates though. Thompson-Thomas also testified that the associates communicated to her that they were afraid to be open and speak their minds for fear of retaliation. She also stated that the associates did not feel their apprehension of the managers was due to the managers being predominately male.

After Cottles was terminated, Wozniak made an announcement to the entire Chicago operation that he was gone. One witness testified that he never heard the term "good old boys" network again after Cottles was fired. Cottles contends that this announcement proves he, as a White man, was fired to appease upper management and improve associate morale. Cottles has no evidence that links his conspiratorial claims regarding Wozniak's announcement to the facts of the case. There is no evidence that Wozniak referred to either Cottles' race or sex, or to the demise of a "good old boy" network when she announced his termination. It is just as plausible and even more logical, given the evidentiary materials reviewed by this Court, that the announcement of Cottles firing to the Center represented Wozniak's attempt to demonstrate to the associates that the management team had been shaken up and the retaliatory attitudes of past managers would no longer be tolerated.

However, Cottles states in his opposition brief that Wozniak told him that she was going to change the perception that "Chicago was run by a bunch of old white men and that she needed to diversify the team by firing a few managers." Wozniak told him "Chicago was run by a bunch

of old white men and that she was hired to change that perception." Furthermore, the materials cited by Cottles reveal that Wozniak was discussing the associates' lack of trust in the Chicago management team and she said the associates "would not trust her until she changed the mix and fired a few managers." Thus, there is an indication that Wozniak and some of the associates believed that the lack of trust the associates had in the managers was because of their racial composition or their gender. Similarly, Wozniak's use of the phrase "changing the mix" could be taken to mean getting rid of White male managers who by virtue of their race and sex intimidated the associates or otherwise did not get along with the associates.

The most compelling evidence that Cottles can point to is Allison Seraphin. As will be discussed below, Seraphin committed several acts of misconduct that was targeted at the associates. Wozniak testified that after one incident with Seraphin, an associate was distraught and crying. It speaks volumes that Allison Seraphin's confrontational behavior and bad performance occurred several times but she was given written reprimands and counseling while Cottles' single infraction resulted in immediate termination. Given the perception of a "good old boys" network, that such perception was linked to the low associate morale, and the fact that Cottles was dealt with rather severely for a first time offense taken together may be sufficient to establish that the Defendant discharged him due to his race, gender or age, or at a minimum that Wozniak thought that firing White male managers would positively impact associate morale.

Defendant cites *Mlynczak v. Bodman*, in which the Seventh Circuit explained that in presenting background circumstances, there must be some causal link between those circumstances and the adverse employment action. 442 F.3d 1050, 1058 (2006). In *Mlynczak*, although an individual supervisor had been found to be a decision maker and "philosophically

favorable to the hiring of minorities," such a showing did not prove that any particular decision of that supervisor was made for discriminatory reasons. *Id.* *Mlynczack* is inapposite to the instant case. Cottles has shown there may have been a perception by Wozniak and Wheeler, Defendant's decision makers, that Chicago was run by a "good old boys" network and there may have been an understanding that the Chicago management team should be diversified. Such a causal link was absent in *Mlynczack*. Furthermore, given Wozniak's statements regarding mixing things up and firing a few managers along with Thomas acknowledgment that some of the associates attributed their lack of advancement to the fact that the managers were mostly White, there is evidence to go forth to a jury that Defendant thought it would eliminate that perception by firing Cottles or some other White male manager. Thus, Cottles has shown background circumstances that demonstrate the Defendant was inclined to discriminate invidiously against White men in favor of minorities and women; and in the alternative, he has shown a logical reason to believe his termination rested on his race or his gender.

### Similarly-Situated Employees

Defendant also argues that Cottles cannot point to any similarly-situated employees that are suitable for comparison under the *McDonnell-Douglas* analysis. Cottles contends Allison Seraphin, an African-American female operations manager, was treated more favorably than him. Cottles also points to two other purportedly similarly-situated employees who were treated better than he; Cathy Wallace and Lori Conti, who were team leads, not operation managers.

In *Keri v. Board of Trustees of Purdue University*, the Seventh Circuit explained what must be produced in order to establish that employees outside of the relevant protected class were treated more favorably. 458 F.3d 620, 645 (7th Cir. 2006). The plaintiff must demonstrate that

the employees were similarly situated with respect to "performance, qualifications and conduct," and that "the relevant aspects of [their] employment situation were nearly identical to [the] alleged comparator[s]." *Id.* (citing *Snipes v. Ill. Dep't of Corrs.*, 291 F.3d 460, 463 (7th Cir. 2002); *Nunnery v. Elgin, Joliet & E. Ry.*, 48 F.Supp.2d 1122, 1131 (N.D.Ind. 1999)). Furthermore, when dealing with disparate disciplinary standards, the plaintiff must normally establish that "the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000). Lastly, the Plaintiff must also show "that the similarly situated employees were treated more favorably at the time of the alleged discrimination against him." *Keri*, 458 F.3d at 645 (citing *Jordan v. City of Gary*, 396 F.3d 825, 834 (7th Cir. 2005)).

In support of Cottles' contention that Seraphin was similarly-situated to him, he points to the following undisputed facts. Both Seraphin and Cottles were operations managers in the same department who reported to Wozniak. Specifically, Wozniak was aware of several complaints from associates about Seraphin's abrasive and brash communication style, lack of leadership and inappropriate behavior. No less than thirteen associates complained of Seraphin's conduct towards them. Defendant contends Seraphin is not an appropriate comparator because she did not make retaliatory statements against the associates and she was also terminated by Wozniak in April 2004. Defendant's metrics of comparison are unnecessarily narrow. Cottles was (allegedly) discharged because of his retaliatory statements; statements that showed his management style was at odds with the type of collegial, respectful relationship Wozniak and

-13-

Defendant were trying to create between the associates and the managers in the Center. Seraphin's conduct was obviously at odds with that relationship as well. Although her relationships were not retaliatory, they were harmful to associates and engendered resentment in several associates.

That Wozniak ultimately terminated Seraphin is no bar to her value as a comparator. Cottles contends that her termination was not immediate like his, and that Seraphin received step discipline and counseling for several of her violations whereas he was terminated immediately. Thus, Cottles can show that Seraphin was treated more favorably than he was treated. This Court agrees with Cottles that Seraphin is a valid comparator. It is strange that Seraphin, an African-American woman, was afforded multiple chances to correct her inappropriate conduct, which was made directly to several associates and caused immediate diminished morale and productivity-one associate began crying, stopped working and went into Wozniak's office after a confrontation with Seraphin, while Cottles was immediately fired for making wild remarks in a meeting where no associates were present.

Cottles also contends that there are at least two more examples of non-White or non-male employees receiving favorable treatment for violations of Defendant's rules. Lori Conti, a female, repeatedly engaged in conduct deemed to be inappropriate workplace behavior by BOA, yet she was not terminated for such behavior but was allowed to receive verbal and written counseling. Cathy Wallace, an African American female, committed a serious security infraction which was deemed by Defendant to be a breach of trust, yet she was not terminated for such behavior, but was allowed to receive only a disciplinary warning. Unlike Seraphin, Conti and

Wallace were team leads, who according to Cottles himself, were subordinate to operations managers and were not supervised directly by Wozniak.

Defendant argues that under *Patterson v. Avery Dennison Corp.*, a plaintiff may not utilize supervisors and subordinates as comparators in the *McDonnell-Douglas* burden-shifting analysis. 281 F.3d 676, 680 (7th Cir. 2002). What that case really explains is that "[w]hen an employer is deciding whether to place a supervisor or a subordinate in a managerial position, the supervisor's additional experience makes it next to impossible for a court to conclude that a subordinate is similarly situated to him." *Id.* Thus, the prohibition on not comparing supervisors with subordinates is not categorical, rather it is tailorable to the specific context of the comparison. Instead of trying to assess the legitimacy of a promotion; here, Cottles contest the legitimacy of discipline.

However, just as the supervisors differ from subordinates in the level of experience, knowledge and job responsibilities in terms of promotional consideration, *see id.*, the two groups must also differ analogously in terms of disciplinary consideration for rules and policy infractions. Cottles cites *Johnson v. Zema Systems Corporation* for the broad proposition that "an employer cannot insulate itself from claims of discrimination simply by providing different job titles to each of its employees." 170 F.3d 734, 743 (7th Cir. 1999). But that case is clearly distinguishable from this action because there, the Court held that the two comparators, although they had different titles, both still occupied the same hierarchical position as intermediate managers. *Id.* at 744. That is clearly not the case here, as team leads are subordinate to operations managers.

In short, Alison Seraphin is an appropriate comparator but that Lori Conti and Cathy Wallace are not.

**Legitimate Nondiscriminatory Reason**

Once the plaintiff establishes a *prima facie* case, a rebuttable presumption of discrimination arises, and the burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)*; Szymanski*, 2002 WL 171977 at *5. If the employer satisfies that burden, the presumption of discrimination is rebutted, and the burden shifts back to the plaintiff to persuade the trier of fact either directly that a discriminatory reason more likely motivated the action or indirectly that the employer's articulated reason for the employment action is unworthy of credence and is but a mere pretext for intentional discrimination. *Szymanski*, 2002 WL 171977 at *5.

Defendant states that Plaintiff was terminated for the retaliatory statements he made at the WOW Pin meeting – not for any reason related to his race, age, or gender. Defendant has not wavered from that explanation and has produced evidence that Wozniak and Wheeler, the two decision makers, relied on Cottles' retaliatory statements in terminating him.

Cottles contends that the retaliatory statements are merely pretext to mask Defendant's invidious discrimination. A plaintiff can submit evidence to show a proffered non-discriminatory reason is pretext. *Johnson*,170 F.3d at 744. Cottles states that he has an otherwise unblemished work history with the Defendant. He also points out that retaliatory statements are not listed as a terminable offense in the Defendant's associate handbook. Cottles also states that the associates to which he directed his purportedly retaliatory statements did not report to him, and thus, he

would have been completely incapable of retaliating against them. He claims he did not make the statements. Lastly, he states the most telling evidence of pretext is that Wozniak informed the entire Center that he had been terminated.

Defendant states Cottles' work history is immaterial because he was not fired due to poor performance; he was fired because of the statements he made at the WOW Pins meeting. At his final meeting with Wozniak, she told him she was firing him because of his statements and that she would not allow him to ruin all of her hard work over the past four months. In a later email to Drummond, Wozniak alluded to the fact that she thought Cottles' statements were a impediment to her trust and relationship building she had accomplished at the Center between management and the associates. This Court agrees with the Defendant that Cottles' work history is immaterial to whether he was fired for the retaliatory statements.

Similarly, Cottles' claims that he never made the retaliatory statements are unavailing because Wozniak was more than justified to believe Clark's, Shelton's and Delgado's versions of the events of the WOW Pins meeting. Wozniak conducted an investigation and no less than three other participants of the WOW Pins meeting told Wozniak Cottles made those statements about getting even. Whether or not a plaintiff in fact committed the act for which the defendant based termination is irrelevant as long as the decision maker is justified in believing the plaintiff had done the act. *Miller v. Univ. of Chicago*, 2007 U.S. Dist. LEXIS 7550 (N. D. Ill. 2007).

Cottles contends that the absence of a formal listing of retaliatory statements as a terminable offense and Defendant's failure to impose step discipline shows pretext. Defendant counters that Cottles' statements were characterized as a loss of trust and confidence on the termination filing and that an employer need not list out every conceivable terminable offense. It

also points out that the handbook to which all of Defendant's employees are subject clearly states that the offenses listed are not all-inclusive and that the Defendant retains the right to levy appropriate punishment, up to and including termination. Courts do not generally assess the appropriateness of an employer's decision, they assess whether there is sufficient the plaintiff has produced enough information to credit the reason as untruthful. *See Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 418 (7th Cir. 2006) ("...the question is never whether the employer was mistaken, cruel, unethical, out of his head, or downright irrational in taking the action for the stated reason, but simply whether the stated reason was his reason: not a good reason, but the true reason.").

Cottles also contends the fact that Wozniak informed the entire Center that he had been terminated is sufficient evidence that his retaliatory statements were not the real reason for his termination. As explained earlier, there is no evidence that Wozniak referred to either Cottles' race or sex, or to the demise of a "good old boy" network when she announced his termination, so there is nothing to connect her announcement to a discriminatory animus or to believe she fired him for some other reason than his statements at the WOW Pin meeting.

Yet, Defendant overlooks Alison Seraphin. Wozniak was aware of several complaints from associates about Seraphin's abrasive and brash communication style, lack of leadership and inappropriate behavior. No less than thirteen associates complained of Seraphin's conduct towards them- one associate went into Wozniak's office crying after a confrontation with Seraphin. Cottles was allegedly discharged because of his retaliatory statements; statements that showed his management style was at odds with the type of collegial, respectful relationship Wozniak and Defendant were trying to create between the associates and the managers in the

Center. Seraphin's conduct was obviously at odds with that relationship as well. Although she did not utter any retaliatory statements, her statements were obviously hurtful to associates and engendered resentment in several of them. A reasonable juror could view Seraphin, an African-American woman, recognize that she was afforded multiple chances to correct her inappropriate conduct towards associates while Cottles was immediately fired for making wild remarks in a meeting where no associates were present, and conclude Defendant's stated reason for terminating Cottles was pretextual.

In short, a reasonable juror can conclude that Defendant's decison to terminate Cottles was pretextual in light of its treatment of Seraphin. Therefore, summary judgement is DENIED as to Counts I and II of the Second Amended Complaint.

### B. Age Discrimination

Cottles also alleges Defendant discriminated against him because of his age in violation of the ADEA. A plaintiff need only show that age was a determining factor, not the only factor in the employer's decision to commit the adverse employment action. *Anderson v. Stauffer Chem. Co.*, 965 F.2d 397, 400 (7th Cir. 1992). A plaintiff may prove his case through the submission of direct evidence, circumstantial evidence or through the *McDonnell-Douglas* indirect burden shifting method. *Id*. In his second amended complaint, Cottles pleads that he was forty-five at the time of his termination; that he met or exceeded all of the Defendant's legitimate job expectations; and that he was treated less favorably than a younger employee, Lee Elder.

Plaintiff has attempted to prove his claim of age discrimination under the familiar *McDonnell-Douglas* burden-shifting framework. In the context of an ADEA claim, the plaintiff must show that (1) he is a member of the protected class; (2) that he was meeting his employer's

legitimate expectations; (3) that he was subject to an adverse employment action; and (4) that the employer either replaced or sought to replace the plaintiff with a substantially younger employee or one outside the protected class. *Anderson*, 965 at 400. Defendant contends that Cottles cannot prove the fourth prong of the ADEA *prima facie* case because he was immediately replaced with Rafael Delgado, who is actually older than Cottles. A failure to show that one was replaced by a younger employee is fatal to a case brought under the *McDonnell-Douglas* burden-shifting method. *See O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308 (1996); *see also Hoffman v. Primedia Special Interest Publications*, 217 F.3d 522, 524 (7th Cir. 2000).

It is undisputed that Delgado filled in for Cottles from the time of his termination in May, 2004 until October, 2004. Cottles urges this Court to disregard Delgado for comparative purposes and to recognize that Lee Elder ultimately was promoted to operations manager to fill the void left by Cottles in October, 2004. Elder was thirty-six at the time. Elder did not become an operations manager until a minimum of four complete months after Cottles was discharged. When determining whether a plaintiff has satisfied the *prima facie* claim, the only relevant comparative employee is the one who replaces or assumes the duties of the terminated employee at or near the time of the termination. Four months is well beyond a reasonable period of proximity. Cottles cannot establish his *prima facie* showing of age discrimination.

In conclusion, Cottles has failed to satisfy the fourth prong of the *prima facie* case because he cannot show that Defendant either replaced or assigned his duties to a younger person upon terminating him.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is **GRANTED** as to Counts III of the Second Amended Complaint.[2] Enter Judgment and Order.

Enter:

/s/ David H. Coar
David H. Coar
United States District Judge

Dated: **March 31, 2008**

---

[2] Cottles separate Motion to Vacate the Magistrate Order Pursuant to 28 U.S.C. §636(b)(1)(C) is denied. That motion is predicated on Cottles' purported need to reach records before Wozniak became the site manager of the Center in order to show Defendant's pretext based on alleged losses of trust and confidence. Simply put, such a request is inappropriate given that it was Wozniak who determined Cottles' statement made up a lack of trust and confidences and characterized it as such on his termination slip. Whatever previous managers determined were breaches of trust and confidence is not material to how Wozniak perceived Cottles' statements.